IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| DERICK J. HENDERSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CIVIL ACTION NUMBER: |
| vs. | ) | CV-25 |
| | ) | JURY DEMAND |
| | ) | |
| WAYNE FARMS, LLC, d/b/a | ) | |
| WAYNE SANDERSON FARMS, | ) | |
| | ) | |
| Defendant. | ) | |

# COMPLAINT

## I.  INTRODUCTION

1.      This is an action for legal and equitable relief to redress discrimination and retaliation against Plaintiff, Derick J. Henderson. The suit is brought to secure the protection of and to redress the deprivations of rights secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e *et seq*., as amended by the Civil Rights Act of 1991 and 42 U.S.C. §1981a, which provide for relief against race discrimination and retaliation in employment.

2.      This is an also an action alleging disability discrimination, including a hostile work environment, pursuant to the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §12101, *et seq*., brought by Plaintiff against Defendant. Plaintiff also alleges that Defendant perceived him as disabled and

1

terminated his employment because of its perception of his disability.

3.    Plaintiff seeks injunctive relief, equitable relief, compensatory punitive, and nominal damages, and reasonable attorney's fees and costs for his claims of race and disability discrimination in his employment, including a hostile work environment and retaliation.

## II.    <u>JURISDICTION AND VENUE</u>

4.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331, 1343(a)(4) and 28 U.S.C. §§2201 and 2202.

5.    A substantial portion of the unlawful employment practices alleged hereinbelow were committed by Defendant within Enterprise, Alabama. Venue is proper in this Court pursuant to 28 U.S.C. §1391(b).

6.    Plaintiff has fulfilled all conditions precedent to the institution of this action under Title VII and the ADA. Plaintiff timely filed his charge of discrimination, on January 30, 2025, which was within 180 days of the occurrence of the last discriminatory act. (Attachment "A") On or about July 17, 2025, the Equal Employment Opportunity Commission issued a Determination and Notice of Rights. (Attachment "B") Plaintiff has timely filed this lawsuit within 90 days of said Determination and Notice of Rights.

7.    Plaintiff requests a jury trial on all issues pursuant to 42 U.S.C. §1981a.

2

## III.    **PARTIES**

8.    Plaintiff, Derick J. Henderson (hereinafter "Henderson" or "Plaintiff"), is an African American citizen of the United States and a resident of the Troy, Pike County, Alabama. At all times relevant to this lawsuit, Plaintiff was employed by Defendant at its Enterprise, Coffee County, Alabama location.

9.    Defendant, Wayne Farms, LLC d/b/a Wayne Sanderson Farms (hereinafter "WSF" or "Defendant"), is an employer doing business in this district. At all times relevant to this action, Defendant is an employer within the meaning of 42 U.S.C. §1981, Title VII of the Civil Rights Act of 1964 along with the ADA. Venue is proper in this Court pursuant to 28 U.S.C. §1367 and 38 U.S.C. §4323(c)(2).

## IV.    **ADMINISTRATIVE EXHAUSTION**

10.    Plaintiff has satisfied all conditions precedent to the filing of this legal action as required by Title VII and the ADA.

11.    On or about January 30, 2025, Plaintiff timely filed a charge of discrimination with the Equal Employment Opportunities Commission against Defendant (832-2025-00146) alleging race and disability discrimination and retaliation among other things.

12.    Plaintiff subsequently received the Determination and Notice of Rights from the EEOC and timely filed this complaint within ninety (90) days of said Notice

which was dated July 17, 2025.

13.    Any and all claims covered by §1981 do not require the filing of an EEOC charge and have been filed within four (4) years of any adverse employment action.

## V.    STATEMENT OF FACTS AND CLAIMS

14.    Plaintiff re-alleges and incorporates by reference paragraphs 1-13 above with the same force and effect as if fully set out in specific detail hereinbelow.

15.    Plaintiff was diagnosed with a chronic, progressively disabling and permanent disability in the form of Multiple Sclerosis (MS) approximately eight years ago.  Recently, the progression revealed the progression to five lesions to the brain and two significant lesions to the spinal cord, causing impairment in a large number of major life activities, including, but not limited to, severe fatigue, insomnia, depression, anxiety, deterioration of cognitive functions, cognitive memory lapses, deterioration of mobility, deterioration of visual capacity, and the deterioration of hearing which affects both the volume of speech and speech itself.

16.    Based on the above, Plaintiff is a person with a disability pursuant to the Americans with Disabilities Act, as amended ("ADA") and is perceived as a person with a disability.

17.    Plaintiff was hired by Defendant on August 29, 2022, as a Shipping Supervisor. Some, but not all, of his job duties and responsibilities included directing

the work of others, appraising performance, hiring, developing, rewarding, suspending, disciplining, discharging, and managing the payroll of subordinate employees.

18.     During Plaintiff's interview and orientation process with Defendant, both independently and through a Recruiter, Plaintiff made it clear that he had a disability that required accommodations as he was employed with another company at the time that provided said permanent accommodation for his disability and he was seeking same with Defendant. This secondary employment was disclosed during recruitment, interviewing, onboarding and then quarterly and annually during Plaintiff's employment.

19.     The accommodation in which Plaintiff needed for his disability was a flexible work schedule which included modified start and ending times for his work day along with possible extended lunch breaks.

20.     During his interviewing process, Plaintiff also disclosed, along with his disability accommodation, he might need a schedule accommodation due to childcare issues in the afternoons along with his religious practice which impacted his weekend availability. Plaintiff's requested childcare and religious accommodations were secondary to his disability accommodation request, which was far the most important.

21.     When Defendant offered Plaintiff a position, he initially declined said offer of employment as the communicated schedule of reporting on-site was at 4:30 p.m. Monday through Friday, with some Saturday in-person reporting.  Plaintiff countered Defendant's offer with an accommodating schedule because of his disability with "a start time of Monday through Friday, before 7:45 p.m. but after 4:30 p.m. CST with no weekend availability."  This schedule was non-negotiable on Plaintiff's part due to his disability and his discussions with his medical professionals and caregiver.

22.     Between August 2, 2022, and Plaintiff's official hire date of August 29, 2022, Defendant communicated flexibility regarding his on-site reporting times. Defendant's agreement to his requested schedule of a start time of "Monday through Friday, before 7:45 p.m. but after 4:30 p.m. CST with no weekend availability"  was acknowledged and accommodated his disability.

23.     Plaintiff accepted this offer of employment from Defendant with the mutual agreement regarding his work schedule and accommodation of same.

24.     On August 29, 2022, when Plaintiff reported to the plant for his orientation and onboarding, he had a one-on-one with Edgar Solar, the HR Supervisor, who reported to the HR Manager, Patricia Powell.

25.     During this meeting, Plaintiff and Mr. Solar discussed Plaintiff's accommodation needs. Mr. Solar reiterated that Defendant, including all HR

leaders/managers, were fully aware of his accommodation needs, the accompanying request, and mutual agreement on the flexible schedule accommodation. Furthermore, the requested flexible schedule accommodation had been approved by Defendant and all HR leaders/managers.

26.    In this meeting, Plaintiff further explained his Multiple Sclerosis disability to Mr. Solar.  At this point, Mr. Solar assured Plaintiff that whether the accommodation was for childcare or Multiple Sclerosis (Plaintiff's disability), there were no operational concerns with the mutually agreed in-person reporting schedule that had been agreed upon by both Plaintiff and Defendant. This schedule accommodation was implemented on the Plaintiff's first day of employment and was continuously honored by Defendant consecutively during his first two years of employment and/or until the discrimination by Megan Gibbs-Hines began as set out below.

27.    During Plaintiff's tenure with Defendant, his general arrival at the plant was between 6:16 p.m. and 6:45 p.m. and general departure between 11:00 p.m. and 11:30 p.m. for 2nd shift shipping notwithstanding routine variances. Plaintiff engaged in work-related communications with his union team leaders and peers prior to 4:30 p.m. before he reported to the plant and again well past 12:30 a.m. after his departure from the plant.

28.    Plaintiff performed all his job duties and responsibilities in a satisfactory manner and had no counseling (verbal or written) regarding his job performance.  Plaintiff further only had favorable performance feedback during his employment with Defendant.

29.    During Plaintiff's first approximately two years of employment (August 29, 2022 to June 18, 2024) his supervisor, who was also the hiring manager during his application process, was Timothy Smith, Caucasian male.

30.    In August 2023, Plaintiff's hiring and direct manager made him aware of his (Smith) concerns of cultural inconsistencies in the Plant's leadership internal communication and processes.

31.    To ensure that all Plant Leaders were aligned, Plaintiff was instructed to complete a serious health condition form and provide it to Defendant's Assistant HR Manager, Lorraine Quackenbush, with the diagnosis of disability from a medical doctor. This FMLA form was submitted and approved by Defendant in September 2023 even though Plaintiff had not requested any type of leave.  This form did, in fact, list Plaintiff's MS diagnosis.

32.    In early October 2023, Plaintiff received an unsolicited and definitive reassignment to primary oversight supervisor of Frozen Shipping. This role is more autonomous than the real-time Fresh Shipping on both shifts, requiring less essential and marginal tasks and demanding less physical interaction and on-floor presence.

33.    With this reassignment, the accommodation of Plaintiff's disability stayed in place, as agreed upon at his hire from August 2022, until approximately July 2024.

34.    During this time, Plaintiff maintained the same schedule routine, known across the entire shipping department and well-known by both Production and Shipping Leadership. Furthermore, during this time, Defendant raised no concerns about the mutually agreed upon flexible schedule accommodation for Plaintiff's disability. Moreover, during this time, Defendant expressed no performance issues, operational concerns, or feedback from Plant Management.

35.    On June 18, 2024, Plaintiff's direct supervisor, Timothy Smith, was constructively discharged.  Mr. Smith did not voluntarily resign his role but was forced to resign through a constructive dismissal. Mr. Smith told Plaintiff on his last day "to watch each other's back" indicating to the plaintiff the overall hostile work environment and leadership culture at WSF.

36.    From June 18, 2024, to approximately July 22, 2024, Defendant's shipping operations lacked overall assigned managerial oversight with the departure of Mr. Smith.

37.    On approximately July 22, 2024, Defendant reassigned Megan Gibbs-Hines ("Gibbs-Hines"), a Caucasian female to assume the role of Interim Shipping and Freezer Manager.  Gibbs-Hines had held the position of First Shift Production

Shift Manager. Gibbs-Hines did not have any shipping experience prior to assuming the role of Interim Shipping Manager.

38.    Upon assuming this interim role, Gibbs-Hines immediately began discriminating against Plaintiff because of his disability and race and causing his work environment to be hostile. Gibbs-Hines further harassed and intimidated Plaintiff because of his disability and race, all of which again caused a hostile work environment for Plaintiff.

39.    On August 2, 2024, Plaintiff had his first meeting with Gibbs-Hines. During this meeting, Gibbs-Hines introductory statement to Plaintiff was "I've been itching to meet the man that has a schedule different than anyone I've seen since I've been at the plant." During this meeting, Gibbs-Hines continued to question Plaintiff's mutually agreed upon flexible schedule accommodation with him by making further comments like "you don't even work weekends . . ." and "well, that's not fair." Gibbs-Hines went on to ask Plaintiff personal questions about his family life, which Plaintiff explained that he did not discuss at work. Plaintiff found this interaction with Gibbs-Hines very hostile towards him, his disability, and the agreed upon flexible schedule accommodation he was working under since his hire with Defendant.

40.    During this meeting, Plaintiff did bring to Gibbs-Hines' attention a potential FLSA violation that he believed was occurring within the Department.

Gibbs-Hines dismissed the issue quickly and did not address Plaintiff's concern over the FLSA violation occurring. Instead, at the end of this meeting, Gibbs-Hines again made statements like "everyone wants that schedule . . . hell, I want that schedule . . ." and "it's not fair that you get to work a schedule that nobody else works in the Plant."

41.    After this meeting, Plaintiff was very concerned with Gibbs-Hines' actions, comments and conduct during the meeting as his schedule accommodation had been in place, and approved by HR, since August 20, 2022, without any problems. Plaintiff's accommodation schedule only became an issue once Gibbs-Hines became the Shipping Manager.

42.    In this meeting with Gibbs-Hines, Plaintiff again explained his religious practice and his specific diagnosis of MS. Plaintiff also told Gibbs-Hines that he attended physical therapy due to his MS. Plaintiff's physical therapy was initially Monday-Friday and then went to Monday, Wednesday and Friday. Plaintiff's physical therapy usually ended at 5:45 p.m. and then he had to drive approximately 27 minutes to the plant to start his shift. Plaintiff went on to further explain to Gibbs-Hines of his personal symptoms and specific diagnosis. However, during this entire meeting, Gibbs-Hines dismissed Plaintiff's disability and agreed-upon accommodations by Defendant.

43.    On August 6, 2024, Gibbs-Hines then mandated that the plaintiff email

11

her dates to attend a mandatory meeting two weeks out at 3:30 p.m. (a time outside of his accommodations) and notice of a mandatory meeting with Gibbs-Hines and Matthew Rials, Plant Manager, on August 7, 2024, at 3:30 p.m. (again, a time outside of Plaintiff's accommodations).

44.     Upon Plaintiff's arrival to this August 7, 2024, meeting, Gibbs-Hines, and Rials stated the purpose of the meeting was to review Supervisor Job Expectations.  Plaintiff was told on two separate occasions, during this meeting, by both Matthew Rials and Gibbs-Hines that signing the Supervisor Job Expectations was not mandatory, as the document was merely a review. Furthermore, on two separate occasions, during this meeting, Plaintiff was also assured that choosing not to sign would not be construed as a refusal.  It was Plaintiff's understanding, at the time of the meeting, that Gibbs-Hines would discuss the document in this meeting with the Shipping Supervisors and each would receive a copy of said document to keep and review when necessary.

45.     Plaintiff arrived at the plant on August 7, 2024, at 6:45 p.m. (his accommodated time) and received a text from Gibbs-Hines to come to Rials' office. The meeting lasted 43 minutes with over 30 minutes of the meeting again discussing Plaintiff's schedule and accommodations. Both Gibbs-Hines and Rials told Plaintiff that they could not find anything regarding his accommodations with regard to his work schedule and was told that he would need to start reporting to work at 4:30

p.m. and stay at the plant until the shift was over (4:30 p.m. to 1:30 a.m.). These directives were contrary to Plaintiff's agreed upon flexible accommodation work schedule that had been in place since his hire. This meeting was hostile by Gibbs-Hines and Rials and continued to dismiss Plaintiff's disability and accommodations in place at the plant.

46.     During this August 7, 2024 meeting, Defendant, by and through Gibbs-Hines and Rials, imposed a requirement for Plaintiff to change his schedule within 30 days, a requirement it described as "set in stone," while communicating no substantive reasoning nor offering alternative options suitable to his pre-existing schedule accommodation for disability. Again, this requirement caused undue stress on Plaintiff and caused him to work in a hostile work environment.

47.     Furthermore, for the first time in his employment, Plaintiff's performance/essential functions of his job descriptions were being questioned as not being performed. Again, Plaintiff had never been counseled regarding any aspect of his job performance until Gibbs-Hines was reassigned as the Shipping Manager.

48.     During this August 7, 2024, meeting, Defendant for the first time stated that it had no record of Plaintiff's disability within his HR file but did have a record of childcare accommodations. Plaintiff requested a copy of said childcare accommodations record; however, was never provided a copy. Moreover, Plaintiff sent an email dated August 31, 2023, to Lorrie Quackenbush, HR, regarding his

diagnosis of Multiple Sclerosis.  Therefore, besides his multiple conversations and meetings at hire with various HR personnel regarding his disability and needed accommodations, Defendant was well aware of his disability and accommodations.

49.    Plaintiff had another meeting with Gibbs-Hines on August 15, 2024, at 3:00 p.m., which lasted from 3:41 p.m. until 5:19 p.m. The 1st and 2nd shift supervisors were in attendance at this meeting as well. Gibbs-Hines continued to rehash all of the information that had already been discussed in prior meetings. Gibbs-Hines again dismissed and ignored Plaintiff's disability and the accommodations he had been working under since his hire with Defendant in 2022. These continued meetings with Gibbs-Hines and her refusal to accept and/or acknowledge Plaintiff's flexible schedule accommodations were causing a hostile work environment for the plaintiff based on his disability.

50.    Because of the undue stress caused by Gibbs-Hines' constant discriminatory actions toward him, Plaintiff could not report to work on August 16, 2024, due to the effects it was having on his disability.  Plaintiff followed Defendant's procedure for calling out by emailing and calling the proper management employees.  Plaintiff explicitly explained that the change in routine caused by Gibbs-Hines was having an adverse effect on him and his health.

51.    Around this time, Stanley Mieth reported to the Plant as Shipping Manager.  However, Gibbs-Hines remained the primary facilitator.

52.    When Plaintiff did not work on August 16, 2024, Gibbs-Hines responded to Plaintiff by telling him that not working on the 16th was not acceptable and does not meet the supervisor's expectations that were discussed with him on August 6, 2024. Gibbs-Hines further told Plaintiff that his choosing not to come to work, was putting unnecessary stress and extra responsibilities on his fellow team members, was not leading by example for his team and was demonstrating a lack of ownership. Plaintiff totally disagreed with Gibbs-Hines' statements regarding his performance as he was out of work for the one day and followed the proper reporting channel for said day off.  On information and belief, employees that are not disabled and/or not viewed as disabled are not treated in this matter for being out of work one day for being sick. Gibbs-Hines' actions and comments further showed her discriminatory and retaliatory treatment of Plaintiff along with creating a hostile work environment for him.

53.    When Plaintiff arrived at work on August 22, 2024, at his accommodated arrival time of 7:45 p.m., he was met by Stanley Mieth and Gibbs-Hines, who informed Plaintiff that he needed to attend yet another meeting.  The meeting started by Gibbs-Hines telling Plaintiff that there were some "performance issues" that needed to be addressed. She proceeded to tell Plaintiff that some of his performance issues had not gotten better and that he was being placed on a 90-day Performance Improvement Plant (PIP).  Again, this is the first time that Plaintiff's

performance was being addressed as not satisfactory. Up until this point, Plaintiff had no history of disciplinary reviews over the span of two years and had received substantial merit increases. The PIP that Defendant, specifically Gibbs-Hines, was placing Plaintiff on was unmeasurable and highly subjective.

54.    Plaintiff believes this PIP was Gibbs-Hines' discriminatory intent of getting around his accommodations for his disability that had been in effect since his hire date with Defendant. During this August 22nd meeting, Plaintiff again complained about the harassment/unfair treatment by Gibbs-Hines as the flexible schedule accommodation had been in place, with no issues, until she came on board in shipping.

55.    After imposing a required schedule change in 30 days on August 7, 2024, less than 30 days, on August 22, 2024 during this impromptu meeting, Defendant placed Plaintiff on an untenable and unmeasurable Performance Improvement Plan (PIP), citing his flexible accommodation schedule as the primary "performance issue."

56.    Ironically, this Performance Improvement Plan (PIP) was implemented on the same day Gibbs-Hines communicated Defendant's reconciliation of Mark Ralls four-year hourly compensation issue in which Mr. Ralls, despite fulfilling a higher-compensated role, was paid for a lesser position to which Plaintiff communicated to Gibbs-Hines during as a concern during their initial August 2,

2024, meeting (FLSA issue). Plaintiff believes this is direct retaliation for his complaint/reporting of the pay issue for Mr. Ralls and additional pay issues Defendant routinely produced.

57.    The very first area of improvement cited by Gibbs-Hines on the PIP was "attendance."  Gibbs-Hines stated that Plaintiff was required to be on-site and present starting at 4:30 p.m. Monday through Friday beginning immediately.  Again, Plaintiff told Gibbs-Hines and Mr. Mieth that he had an accommodation for his disability and his work schedule had been set from his initial hire.  Plaintiff told them that he could not be at work at the times they were demanding he be at work due to his disability.

58.    Gibbs-Hines told Plaintiff that "she was aware of the accommodation" and "understood that [he] took this job with the intention of having a certain schedule" due to his disability.  She falsely told Plaintiff that his personnel and HR file had no medical documentation in it relating to his disability.  Again, this information was false as he turned in the FMLA form in September of 2023 that was approved by Defendant.

59.    During this meeting which was facilitated by Gibbs-Hines, in conjunction with Alfredo Moreno/Jose Garca, Complex Human Resources Manager, and Stanley Meith, who reported to the facility as new Shipping and Freezer Manager post Timothy Smith's constructive dismissal, the HR Manager

17

repeatedly stated, "this is not going to work," showing visible frustration and increasingly raising his tone.  The Manager finally just told Plaintiff to "go home" and "we'll decide."  The Manager told Plaintiff that he needed to either continue via the PIP or leave his job, however, Plaintiff had no intention of leaving his job.  In order to complete the subjective PIP, Plaintiff would have to adhere to a new work schedule, which was not accommodating to his disability.  Plaintiff told them he was not resigning his position as he had not done anything wrong and there was nothing inadequate or deficient with his performance.

60.    Plaintiff denies that he became argumentative, loud or uncooperative in this meeting as Defendant is alleging.[1]  He did, during this meeting, again express to Alfredo Moreno/Jose Garca his concerns of continued harassment, unfair treatment, hostile work environment, and retaliation by Gibbs-Hines as his schedule accommodation had been in place, with no issues prior to Gibbs-Hines coming on board in Shipping.  Plaintiff was also attempting to ascertain the reason(s) behind the PIP as his performance had not been in question until Gibbs-Hines made it an issue over her continued denial of his schedule accommodation. Plaintiff further requested a copy of said PIP and did not receive a copy of same.

---

[1] As Defendant mandated Plaintiff's participation in its annual auditory testing, which was performed on-site through its vendor, it was fully aware of his deterioration of hearing (another effect of the MS).  Because of his deterioration of hearing, which was documented in his medical file, Plaintiff speaks more loudly than the normal person who does not have Multiple Sclerosis.

61.    Because the PIP meeting was abruptly ended on August 22, 2024, and Plaintiff was told to go home by the HR Manager, Plaintiff inquired if he was to report to work the following day, August 23, 2024, and he was again told loudly "go home" and "we will decide," with no specified return to work date.  At that point, Plaintiff was escorted off the premises at 8:54 p.m.

62.    Plaintiff possessed a personal phone as well as a separate phone designated specifically for work, which remained unmonitored outside of his scheduled hours.  After explicitly asking Defendant, on Thursday, August 22, 2024, if he was to report to work the following day, Friday, August 23, 2024, and Defendant stating, "just go home" and "we'll decided," with no specified return to work date left Plaintiff without any direction at that time.  Once leaving the plant and going home as instructed, Plaintiff did not monitor is work phone.

63.    On Sunday, August 26, 2024, and again on August 27, 2024, at 1:35 a.m., Plaintiff sent a text message to Defendant stating that he was "Not well. Sick." The culmination of events, including the abrupt dismissal from work, significantly exacerbated Plaintiff's persistent disability symptoms, including extreme fatigue, cognitive changes, and psychological distress.  Upon arriving home the night of August 22, 2024 (Thursday), Plaintiff remained in bed the entire day of August 23, 2024 (Friday) and throughout that weekend attempting to recover.

64.    On late Monday night, August 26, 2024, or early Tuesday morning (August 27, 2024), when Plaintiff was reviewing text communications, he then noticed a text from Defendant time-stamped as previously send on the evening of Friday, August 23, 2024.  By abruptly sending Plaintiff home with no return date, Defendant had caused an absence of physical, in-person supervisory oversight of second-shift shipping operations as Michael Wason was on PTO at the time.

65.    Overwhelmed during this period, Plaintiff did not notice Defendant's text communication until late Monday night, August 26, 2024, or early Tuesday morning, August 27, 2024, and immediately responded upon becoming aware of said communication.  Furthermore, during this time, Plaintiff was attempting to seek the proper avenue for escalating procedures. Plaintiff requested this information be provided to him by Defendant but was not provided same.

66.    With regards to Defendant's contention, in this case, that it was first made aware of Plaintiff's secondary job on August 28, 2024, is blatantly false. Defendant's Human Resource representative, Jessica Jones, is also a former human resource employee of Plaintiff's secondary employer. She was employed at this secondary employer since his hire, and in January 2024, began employment with Defendant as a human resource representative. Plaintiff also discussed his accommodations at the other employer during his onboarding process when explaining the flexible schedule accommodations he was needing with Defendant.

20

67.    Defendant demonstrated its continued unethical behavior by creating a hostile environment at Plaintiff's secondary employment, which subsequently resulted in him missing three days of work at this employer while the secondary employer's human resource manager investigated the matter Defendant maliciously produced with intent to cause further harm to Plaintiff.

68.    Defendant was fully aware of Plaintiff's secondary employment.  In its ongoing and desperate attempt to fabricate policy violations to conceal the pretext behind its discriminatory actions, Defendant's local leadership appeared to have strategically executed this unrequested leave of absence, fully aware that Plaintiff would inadvertently violate its recently introduced Short-Term Disability policy by reporting to his secondary employer while on Short-Term disability leave with Defendant.

69.    While Plaintiff was out of the office after being told "to go home," he learned that Defendant placed him on a leave of absence, which he did not request. Plaintiff also had vacation or personal days to take for the time he was required by Defendant to be out of work.  Plaintiff was able to work and willing to do so under his previous accommodating flexible work schedule.

70.    Plaintiff spoke with Gibbs-Hines in the August 2nd and August 7th meetings and again in the August 15th post group meeting expressing his request for

confidentiality and fear that she was treating him differently based on his disability and race.

71.    Furthermore, Plaintiff sent a letter to HR, on September 2, 2024, outlining his concerns regarding his treatment by Defendant, specifically, Gibbs-Hines and including Alfredo Moreno [HR], relating to actions being taken against him, i.e., schedule change, PIP, etc.  Plaintiff felt that Defendant, and specifically Gibbs-Hines, were treating him differently because of his disability and race with regards to his flexible schedule accommodation that had been in place since his hire with no issues from Defendant until Gibbs-Hines came on board in shipping.

72.    Plaintiff reported to work on September 11, 2024, as requested by Defendant.  However, Plaintiff indicated that he would return under the mutually agreed upon, pre-existing permanent reasonable accommodations he was working under prior to Gibbs-Hines coming into the Shipping Department.

73.    Plaintiff was terminated on September 24, 2024, without cause, for alleged performance issues/PIP, which were discriminatory reasons and pretext for race and disability discrimination.

74.    On information and belief, Plaintiff was terminated because of his disability, his record of a disability, and/or Defendant's perception of his disability in violation of the Americans with Disabilities Act Amendments Act ("ADAAA").

75.    Plaintiff also believes he was terminated because of his race, African American, in violation of Title IV of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. §1981.

76.    Plaintiff has suffered lost wages, severe emotional distress, embarrassment, and humiliation as a result of the harassment and Defendant's conduct.

77.    Defendant's actions were willful, with malice and with reckless disregard for Plaintiff's rights.

## FIRST CAUSE OF ACTION: DISABILITY DISCRIMINATION PURSUANT TO THE AMERICANS WITH DISABILITIES ACT, AS AMENDED ("ADA"), 42 U.S.C. §12101, *et seq*.

78.    Plaintiff re-alleges and incorporates by reference paragraph 1-77 above with the same force and effect as if fully set out in specific detail hereinbelow.

79.    Plaintiff brings this claim for disability discrimination pursuant to the Americans With Disabilities Act, as amended (ADA), 42 U.S.C. §12101, *et seq*.

80.    Plaintiff is a person with a disability pursuant to the Americans with Disabilities Act, as amended ("ADA").

81.    Plaintiff also alleges that Defendant perceived him as disabled and terminated him because of its perception of his disability.

82.    These facts include, but are not limited to, statements made by management and decision makers regarding Plaintiff's job performance, Plaintiff's

PIP, the falsity of Defendant's reason(s) for Plaintiff's termination, and evidence of preferential treatment given to non-disabled employees.

83.    Defendant's proffered reasons for Plaintiff's PIP and ultimate termination were pretext for disability discrimination.

84.    As a result of this discriminatory treatment, Plaintiff suffered damages in the form of lost wages, emotional distress, and other compensatory damages.

85.    Defendant acted with either malice or with reckless indifference toward Plaintiff's federally protected rights.

86.    Plaintiff seeks to redress the wrongs alleged herein and this suit for back-pay plus interest, compensatory damages, punitive damages, and an injunctive and declaratory judgment is his only means of securing adequate relief.  Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## SECOND CAUSE OF ACTION: RACE DISCRIMINATION PURSUANT TO 42 U.S.C. §1981 & TITLE VII

87.    Plaintiff re-alleges and incorporates by reference paragraph 1-86 above with the same force and effect as if fully set out in specific detail hereinbelow.

88.    Plaintiff brings this claim for race discrimination pursuant to Title VII of the Civil Rights Act of 1964, as amended in 1991, and 42 U.S.C. §1981.

89.    Plaintiff is African American.

90.    Based on the totality of the facts presented above in paragraphs 14-77,

Plaintiff has been discriminated against because of his race in his terms of employment with Defendant, including but not limited to his termination. These facts include, but are not limited to, statements made by management and decision makers regarding Plaintiff's job performance, Plaintiff's PIP, the falsity of Defendant's reason(s) for Plaintiff's termination, and evidence of preferential treatment given to non-African-American employees.

91.     Defendant's proffered reasons for Plaintiff's PIP and ultimate termination were pretext for race discrimination.

92.     As a result of this discriminatory treatment, Plaintiff suffered damages in the form of lost wages, emotional distress, and other compensatory damages.

93.     Defendant acted with either malice or with reckless indifference toward Plaintiff's federally protected rights.

94.     Plaintiff seeks to redress the wrongs alleged herein and this suit for back-pay plus interest, compensatory damages, punitive damages, and an injunctive and declaratory judgment is his only means of securing adequate relief.  Plaintiff is now suffering and will continue to suffer irreparable injury from the Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## THIRD CAUSE OF ACTION: RETALIATION PURSUANT TO 42 U.S.C. §1981

95.     Plaintiff re-alleges and incorporates by reference paragraph 1-94 above with the same force and effect as if fully set out in specific detail hereinbelow.

96.    Plaintiff engaged in protected activity complaining about his treatment during his employment, based on his race and disability.

97.    Plaintiff also made management aware of FLSA violations.

98.    Plaintiff was then placed on a PIP and subsequently terminated because of his complaints/actions.

99.    Defendant's actions, which happened within days and weeks of Plaintiff's complaints, are causally related to Plaintiff's protected activity.

100.    Defendant's reasons for placing Plaintiff on a PIP and terminating him were pretext for retaliation.

101.    As a result of this retaliatory treatment, Plaintiff suffered damages in the form of lost wages, emotional distress, and other compensatory damages.

102.    Defendant engaged in the practices complained of herein with malice and/or reckless indifference to Plaintiff's federally protected rights.

103.    Plaintiff seeks to redress the wrongs alleged herein and this suit for back-pay plus interest, compensatory damages, punitive damages, and an injunctive and declaratory judgment is his only means of securing adequate relief.  Plaintiff is now suffering and will continue to suffer irreparable injury from Defendant's unlawful policies and practices as set forth herein unless enjoined by this Court.

## VI.  <u>PRAYER FOR RELIEF</u>

**WHEREFORE**, Plaintiff respectfully prays that this Court assume jurisdiction of this action and after trial:

1.      Grant Plaintiff a declaratory judgment holding that actions of Defendant described herein above violated and continue to violate the rights of Plaintiff as secured by Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, and the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §12101, *et seq*.

2.      Grant Plaintiff a permanent injunction enjoining Defendant, its agents, successors, employees, attorneys, and those acting in concert with Defendant and on Defendant's behalf from continuing to violate Title VII of the Civil Rights Act of 1964, 42 U.S.C. §1981, and the Americans with Disabilities Act, as amended ("ADA"), 42 U.S.C. §12101, *et seq*.

3.      Grant Plaintiff an Order requiring Defendant to make Plaintiff whole by awarding him reinstatement, back-pay, interest, unpaid personal days and weekly pay discriminatorily withheld, front-pay in lieu of reinstatement, compensatory, punitive, and/or nominal damages.

4.      Plaintiff further prays for such other relief and benefits as the cause of justice may require, including but not limited to, an award of costs, attorney's fees, and expenses.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL
TRIABLE ISSUES**

Respectfully submitted,


**/s/ *Gregory O. Wiggins***
Gregory O. Wiggins
Counsel for Plaintiff
WIGGINS, CHILDS, PANTAZIS,
    FISHER & GOLDFARB, LLC
The Kress Building
301 19th Street North
Birmingham, Alabama 35203
205/314-0500
gwiggins@wigginschilds.com


**DEFENDANT'S ADDRESS TO BE SERVED
VIA CERTIFIED MAIL:**

Wayne Farms, LLC d/b/a
    Wayne Sanderson Farms
c/o Registered Agent
CT Corporation System
2 North Jackson Street, Suite 605
Montgomery, Alabama 36104